IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **ROBERT JASON BURDICK, #454219,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **NO. 3:22-cv-00031** |
| | ) | |
| **WARDEN MARTIN FRINK,** | ) | **JUDGE CAMPBELL** |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

### I. INTRODUCTION

Around the turn of the 21st century, a series of rapes was committed in Davidson and Williamson Counties and attributed to a single at-large suspect, nicknamed "the Wooded Rapist." Beginning in 2008, Petitioner Robert Jason Burdick was prosecuted and convicted of those crimes. Petitioner has filed this pro se action for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging one such conviction: his 2011 conviction in Williamson County Criminal Court on charges of rape, aggravated kidnapping, and aggravated burglary—crimes which he committed in 2004. (Doc. No. 1.) Respondent filed the state-court record (Doc. No. 13) and an Answer. (Doc. No. 14.) Petitioner filed a Reply to Respondent's Answer (Doc. No. 17), completing the briefing of the issues before this Court.

For the reasons discussed below, the Court finds that an evidentiary hearing is not required to resolve this matter, as Petitioner is plainly not entitled to habeas relief. *See Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001) (stating that evidentiary hearing is not required "if the record clearly indicates that the petitioner's claims are either barred from review or without merit"). His Petition will be denied and this action will be dismissed with prejudice.

## II. PROCEDURAL HISTORY

On May 12, 2008, Petitioner was indicted by a Williamson County grand jury and charged, in Case Number II-CR053486, with fourteen crimes related to a series of rapes that occurred between 1999 and 2004. (Doc. No. 13-1 at 8–13.) The trial court granted Petitioner's motion to sever these fourteen counts of indictment so as to hold separate trials concerning each of three alleged criminal episodes. (*See* Doc. No. 13-5 at 6.) But after counts one through seven were retired and counts eight and eleven were dismissed (*see* Doc. No. 13-1 at 1), only two trials were held in Williamson County. First, Petitioner was tried and convicted in 2010 on counts nine and ten (aggravated rape and especially aggravated kidnapping), charges arising from his 1999 crimes against a minor victim with the initials E.M. *See State v. Burdick*, No. M2011-01299-CCA-R3CD, 2012 WL 2151489, at *1 (Tenn. Crim. App. June 13, 2012).

Then, beginning November 30, 2011, Petitioner was tried on the remaining three counts (counts twelve, thirteen, and fourteen (Doc. No. 13-1 at 11)), all of which involved a Williamson County victim identified by the initials K.A. The jury found Petitioner guilty of the 2004 rape, aggravated kidnapping, and aggravated burglary of K.A. For these crimes, Petitioner was subsequently sentenced to prison terms of 12, 12, and 6 years, respectively, to be served consecutively to one another and to sentences imposed by the Davidson County Criminal Court in other proceedings against Petitioner. (Doc. No. 13-4 at 90–92.) Petitioner's Motion for New Trial (*id.* at 93–95) was denied on April 23, 2012. (*Id.* at 116–18.)

Plaintiff appealed the convictions on counts 12–14 and his cumulative 30-year sentence to the Tennessee Court of Criminal Appeals (TCCA). *State v. Burdick*, No. M2012-01071-CCA-R3CD, 2013 WL 2642313, at *1 (Tenn. Crim. App. June 11, 2013). The TCCA affirmed, and the Tennessee Supreme Court denied Petitioner's application for permission to appeal on November

2

13, 2013. Petitioner then instituted post-conviction proceedings in the trial court, raising claims

including the ineffective assistance of counsel. The trial court denied post-conviction relief after

holding an evidentiary hearing, and Petitioner appealed. The TCCA again affirmed the trial court,

finding that Petitioner received effective assistance from his trial and appellate counsel. *Burdick*

*v. State*, No. M2020-00141-CCA-R3-PC, 2021 WL 2499313 (Tenn. Crim. App. June 18, 2021).

Petitioner then timely filed his habeas petition in this Court.

### III. FACTS

The following summary of the facts is taken from the TCCA's decision on direct appeal.

As the TCCA summarized:

> At trial, the victim, K.A., testified that in November 2004, she was living on
> Williamsburg Road in Brentwood. On the night of November 3, her eleven-year-
> old daughter fell asleep around 9:00 or 9:30 p.m., and her husband went to bed
> shortly thereafter. The victim stayed in the great room, which she also referred to
> as the "green room," and fell asleep on the couch while watching television. The
> victim had not locked the French doors in the great room, which led outside, and
> the blinds on the windows were not completely closed. The victim woke when she
> felt someone wearing fingerless wool gloves place a hand over her eyes. The
> perpetrator told the victim, "Shush, don't say anything."
>
> The victim said the perpetrator told her to get up and go to the doors to the deck.
> The victim, who was wearing only a white or cream-colored nightgown, complied
> with the perpetrator's order. She tried to be calm and looked straight forward in an
> attempt to not seem "confrontational." The perpetrator led her to the door and onto
> the deck; she did not walk out of the house voluntarily. The victim told the
> perpetrator, "I just want my family to be safe." She testified, "I don't particularly
> remember [if the perpetrator made] a response. 'They will be,' perhaps, but I can't
> remember."
>
> The victim said that the perpetrator guided her down the steps of the deck and told
> her to walk toward the trees by the "creek line" at the eastern edge of the property.
> The location was "pretty remote from the house, from the driveway, [and] from the
> next house." The evening was dark and overcast, and the ground was wet from rain.
> The victim urinated on herself while walking. Eventually, the perpetrator pushed
> her to the ground, face first; covered her eyes with duct tape; and ordered her to
> undress. After she removed her nightgown, he told her to lie down, and she
> complied. The victim heard the perpetrator unzip his pants. When the victim was
> "half upright," the perpetrator pulled her head toward his pants and directed her

3

hands toward his penis; he was not wearing a condom. The perpetrator ordered her to perform fellatio and told her, "Don't f[* * *] it up; you know what to do." She thought he was implying that he would react with violence if she tried to hurt him. The victim said that after three or four minutes, the perpetrator removed his penis from her mouth. She heard him adjust the zipper on his pants, open a condom packet, and put on the condom. He leaned over her and rubbed, stroked, and kissed her breasts. From the contact, she discerned that he was wearing a wool ski mask that had an opening for his mouth. The victim lay flat on the ground, the perpetrator got on top of her, and he penetrated her vagina with his penis after using his saliva for lubrication. During intercourse, the perpetrator asked the victim to kiss him, and he kissed her breasts and put his tongue in her mouth. She was afraid and believed she had to cooperate or "the whole situation could spiral out of control."

The victim said that after five or six minutes, the perpetrator withdrew his penis. She heard a dog barking nearby, startling them. The perpetrator told her, "Shush," and ordered her to get dressed. After she pulled on her nightgown, he guided her toward her house. The victim, who still had duct tape on her eyes, walked forward with her arms in front of her. She tripped and felt the perpetrator steady her and push her toward the bottom of the steps to the deck. At the bottom of the steps, the perpetrator told the victim to remove the tape from her eyes. She tried to remove it slowly, but he instructed her "rip it off" and took the tape from her. He told her, "Go up the steps, go inside the house, don't look back, and wait to call the police."

The victim said that she went up the stairs and, once she was inside the house, locked the door and closed the blinds. She looked in on her daughter, who was still sleeping. She made sure the rest of the doors in the house were locked then went to her bedroom. Her husband woke, and she told him that she had been raped. The victim and her husband went to the den because she felt safer in a room that was "not so open [and was] in the middle of the house." The victim told her husband the details of the incident, and he called the police. The victim smoked a cigarette to calm herself but did not shower, wash, change clothes, brush her teeth, use the bathroom, or drink water. She stated that she "wanted to make sure everything was preserved, conserved, and nothing disturbed."

The victim said that the police and paramedics responded to her house immediately. The paramedics took her, still wearing her nightgown, to the Williamson County Medical Center. When she arrived, the hospital staff had her stand on a plastic sheet on the floor and disrobe. They combed her hair, examined her body, and took photographs of her injuries and the mud and debris on her body. The staff performed a rape kit, collecting swabs from her mouth, the skin of her breast, and her vaginal region. While at the hospital, the victim told Detective Adrian Breedlove about the incident. The victim said that she did not know the appellant prior to the rape.

On cross-examination, the victim said that the dog she heard barking that night was a Boston Terrier and that the barking lasted for a couple of minutes until it was

called by its owner. After the rape, the victim was bruised on her back, arm, and leg.

The victim's husband testified that when he went to bed on the night of November 3, 2004, the victim stayed awake to watch television. In the early morning hours of November 4, he was awakened by the victim's calling his name. The victim told him that she had been raped. She appeared disheveled and had "leaf debris" and wet spots on her nightgown. She was trembling and on the verge of crying. The victim's husband called the police and reported the rape. The police quickly responded to the house, and the victim was taken to the hospital.

The victim's husband said that prior to the night of the rape, he had installed "motionsensing lights" under the deck. After the rape, he checked the lights and found that the light bulbs had been unscrewed.

Al Dean Ketner testified that on November 4, 2004, he spent the night with his girlfriend, who lived next door to the victim. Around 1:00 or 1:30 a.m., he took his dog, a Boston Terrier, on a walk without a leash. Ketner said that the dog was normally quiet, but while they were outside, she began barking. The dog was "very agitated ... [and] alarmed." Ketner looked around and saw a female on the ground and a male standing over her. Initially, Ketner thought the victim was outside with her husband. Ketner tried to call his dog back, but she continued to bark. Ketner saw the victim stand and hurriedly walk to her deck. Ketner and his dog returned to his girlfriend's house.

Ketner said that the next morning, he saw the police at the victim's house. He decided that the man he saw the previous evening must not have been the victim's husband. Accordingly, he went next door and told the detectives what he had seen.

Brentwood Police Detective Adrian Breedlove testified that in the early morning hours of November 4, 2004, his supervisor, Lieutenant Campsey, instructed him to go to the hospital, where he interviewed the victim about the incident. After the medical personnel were finished examining the victim, Detective Breedlove took possession of the evidence they had gathered, including the rape kit, and took the items to the Tennessee Bureau of Investigation (TBI) crime laboratory for testing.

Brentwood Police Detective John Wood testified that early on the morning of November 4, 2004, he responded to a report of a rape on Williamsburg Road. When he arrived, the fire department, Lieutenant Campsey, and a couple of other detectives were at the scene. Lieutenant Campsey appointed Detective Wood to be the lead investigator. Detective Wood said that no fingerprints of any evidentiary value were found at the scene. Detective Wood noticed that the lights underneath the deck were loose, as if the bulbs "had been unscrewed just to the point to where they wouldn't light up." Detective Wood found cigarette butts in the back yard, and testing revealed the DNA of an unknown person.

5

Detective Wood said that after the TBI crime laboratory tested the swabs taken from the victim, a DNA profile of the perpetrator was found. However, at that time a match could not be made. Subsequently, in April 2008, the appellant was developed as a suspect, and a DNA sample was taken from him.

On cross-examination, Detective Wood said that when the victim returned home from the hospital, she showed Detective Wood the places where the incident occurred. He said that it was not raining when he was at the house but that it had been for quite a while earlier in the evening. The ground was wet, and he found a muddy shoe print on the deck. However, the print was not "very good" and did not assist in the investigation. At the conclusion of Detective Wood's testimony, the parties entered the following stipulation:

> [T]he Tennessee Bureau of Investigation conducted its DNA comparison using a DNA sample obtained from the [appellant]. Following the taking of the sample in May of 2008, all proper procedures were followed to assure the integrity of the sample prior to the analysis by the Tennessee Bureau of Investigation.

Dr. Ronald Hagan, a Williamson County Medical Center emergency room physician, testified that he was working overnight on November 4, 2004, when the victim came into the emergency room. After the victim reported being raped, Dr. Hagan performed an examination. He saw a small bruise on the victim's lower abdomen above her pubic area and below her navel but could not estimate the age of the bruise.

Dr. Hagan said that he and Nurse Knotts performed a rape kit on the victim. Specifically, he collected vaginal swabs, oral swabs, and pubic hair "combings." Additionally, based upon the victim's report that the appellant kissed her breasts, Dr. Hagan collected swabs from the victim's breasts. He also took a blood sample from the victim and collected her nightgown.

Victoria S. Knotts, a registered nurse, testified that she was working at the Williamson County Medical Center when the victim came into the emergency room. She said that she had the victim stand on a sheet on the floor while removing her nightgown to preserve any evidence that might be dislodged during disrobing. Afterward, Knotts collected the nightgown and the sheet as evidence. She also collected as evidence the sheets and blankets the victim touched while being transported in the ambulance. Knotts assisted Dr. Hagen during the examination.

Agent Michael Turbeville, a forensic scientist with the TBI crime laboratory, testified that he examined the victim's nightgown and found dirt but no semen. He did not examine the sheets taken from the hospital because TBI policy was to examine the items "most intimate to the victim ... [and] if there's a recovery of DNA evidence, then that is a point we stop." Agent Turbeville examined the vaginal swabs taken from the victim and found no semen. He said there were many reasons

6

for the lack of semen, such as the perpetrator not ejaculating, wearing a condom, or ejaculating somewhere other than the victim's vaginal area. The vaginal swab contained only the victim's DNA. Agent Turbeville said that no semen was found on the oral swabs. Agent Turbeville also examined the swabs taken from the victim's breasts and found the appellant's DNA. The DNA found on the cigarette butts retrieved from the scene did not match the appellant's DNA.

The State rested its case-in-chief, and the appellant elected not to put on proof. The jury found the appellant guilty of rape, aggravated kidnapping, and aggravated burglary. The trial court sentenced the appellant to twelve years for the rape conviction, twelve years for the aggravated kidnapping conviction, and six years for the aggravated burglary conviction. The court ordered the sentences to be served consecutively for a total effective sentence of thirty years.

*State v. Burdick*, 2013 WL 2642313, at *1–4.

On post-conviction appeal, Petitioner asserted claims "that counsel was ineffective: (1) for failing to challenge the trial court's improper application of enhancement factors during sentencing, and (2) for failing to challenge law enforcement's placement of a GPS tracking device on his vehicle." *Burdick v. State*, 2021 WL 2499313, at *1. The facts underlying those claims were summarized by the TCCA, as follows:

[At the evidentiary hearing], the Petitioner admitted that an issue about consecutive sentencing was raised on appeal, and this court remanded the case to the trial court to make findings regarding the issue. The Petitioner claimed that he did not see how the enhancement factor regarding prior criminal convictions or criminal behavior applied "since it was all under one indictment[.]" However, he acknowledged that he had cases pending in Davidson County when he was sentenced on the Williamson County offenses, but he continued to allege, "[a]ll I was saying [is] it was all under that same indictment."

The Petitioner said that during the course of his proceedings, he learned that a GPS monitoring device was attached to his vehicle, but neither trial nor appellate counsel ever raised an issue about the suppression of any evidence obtained therefrom. He thought his two trials[1] concluded before the United States Supreme Court issued its opinion in United States v. Jones, 565 U.S. 400 (2012), holding that law enforcement could not place a GPS monitoring device on a vehicle without a warrant, but that his appeals were in the appellate pipeline when Jones was decided, and his attorney should have raised a Fourth Amendment claim.

---

[1] As previously mentioned, Petitioner was tried and convicted on counts 9 and 10 of the 14-count indictment before being tried and convicted on counts 12, 13, and 14. His post-conviction proceedings related to both trials/convictions were consolidated for hearing on November 26, 2019. (Doc. No. 13-32.)

7

On cross-examination, the Petitioner stated that counsel briefly discussed the GPS issue with him but said that the issue "hasn't been decided; it's legal, they can do this[.]" However, the Petitioner admitted that no evidence was used at trial based on the GPS device and that he was already in jail when the buccal swabs were taken from him. He simply extrapolated that the buccal swabs were fruit of the poisonous tree because the GPS device was placed on his vehicle before he was arrested.

Captain David O'Neil of the Brentwood Police Department testified that he initially became involved in the investigations involving the Petitioner in 1999 when he responded to one of the rape calls as a patrol officer. He recalled that that case was ultimately retired or dismissed at the request of the victim.

Turning to the issue about the GPS device, Captain O'Neil stated that he and his partner were part of the surveillance team "that was following [the Petitioner] around." He remembered that the Petitioner was developed as a suspect on April 27, 2008. The next day, Captain O'Neil and his partner watched the Petitioner at his place of employment and then followed him with visual surveillance to TG's Restaurant in Lavergne. After the Petitioner left the restaurant, Captain O'Neil and his partner gathered the utensils used by the Petitioner with the consent of the restaurant owner. They submitted the items to the Tennessee Bureau of Investigation ("TBI"), which confirmed that the DNA on those items matched the DNA collected of the unknown suspect in multiple rapes in Williamson and Davidson Counties. The Nashville Police Department used that information as probable cause to obtain the swabs from the Petitioner after his arrest on May 1, 2008.

Captain O'Neil testified that they placed a GPS tracker on the Petitioner's vehicle on Tuesday, April 29, 2008, the day after the utensils were collected from the restaurant. He said that Jones had not yet been decided, and they were acting in good faith on an older decision that said a tracking device could be placed on a vehicle without a warrant. Captain O'Neil stated that they did not gain any information from the tracking device and were really just using it to protect the public until they could arrest the Petitioner, who was already a suspect. He said that they continued with visual surveillance during that period as well, and the purpose of the GPS was to maintain the Petitioner's location if visual surveillance was lost on him. Captain O'Neil recalled that the Petitioner had become a suspect based on the observations and efforts of Officer Hamm with the Brentwood Police Department. In light of information gathered by Officer Hamm, the Brentwood and Metro Nashville Police Departments began visually surveilling the Petitioner, which led to the collection of the utensils at the restaurant. Captain O'Neil recalled that a John Doe warrant with the suspect's DNA profile was issued in Davidson County prior to the aforementioned surveillance.

Captain O'Neil reiterated that there was no evidence gathered from use of the GPS device and that the Petitioner was identified as a suspect prior to the GPS being attached to his vehicle.

      . . .

Trial counsel [who represented Petitioner during his second trial[2]] said that she was familiar with the enhancement factors that could be used in sentencing, one of which was a defendant's prior convictions or "[p]rior criminal conduct that would have been conduct that would have occurred prior to the acts that the defendant was being sentenced [on]." At the time counsel represented the Petitioner, she was aware that he had criminal cases pending in Davidson County relating to offenses that occurred prior to the offenses that resulted in convictions in Williamson County. The Petitioner's sentencing report reflected that prior criminal activity.

Trial counsel testified that she and the Petitioner discussed the issue about the GPS device being placed on his vehicle. She recalled that Jones was "in the pipeline ... [and] obviously ... on [her] radar." She spoke with Captain O'Neil and another detective, as well as reviewed the discovery, before advising the Petitioner that she would not file an additional motion to suppress based on Jones. She explained that it was her opinion that there was no legal basis to proceed with such motion because the DNA evidence had been obtained prior to the GPS device being attached to his car and no evidence had been obtained as a result of the GPS device. Trial counsel noted that she had already filed and litigated a motion to suppress regarding the search warrant and warrantless arrest, but after her investigation she did not believe there was a basis to proceed with a motion to suppress based upon the GPS tracker.

On cross-examination, trial counsel acknowledged that there was not a strategic reason for not filing a motion to suppress pursuant to Jones "[o]ther than there wasn't any evidence to suppress." She reiterated on redirect that she had an ethical duty to not raise issues unsupported by evidence, "hence [she] did not file it."

*Burdick v. State*, 2021 WL 2499313, at *1–3.

## IV. CLAIMS OF THE PETITION

The Petition asserts the following claims to habeas relief:

1.    The rape conviction was not supported by sufficient evidence, because the essential

element of force or coercion was not proved beyond a reasonable doubt.

---

[2]    Only Petitioner's counsel during his trial on counts 12, 13, and 14, Attorney Dana Ausbrooks, testified at the post-conviction evidentiary hearing. Attorney Ausbrooks was originally appointed as defense counsel for proceedings on counts 9 and 10 as well, but retained counsel was substituted and continued the representation throughout those severed proceedings. *See Burdick v. State*, 2021 WL 2499313, at *3.

2.     The aggravated kidnapping conviction was not supported by sufficient evidence, because the trial court failed to instruct the jury properly that, under *State v. White*, 362 S.W.3d 559 (Tenn. 2012), the essential element of substantial interference with the victim's liberty must, as a matter of due process, be supported by proof sufficient to distinguish it from the interference with liberty that is incidental to the commission of rape.

3.     Petitioner received the ineffective assistance of counsel when:

(a)(1) Trial counsel failed to file a motion to suppress evidence gleaned as a result of the warrantless placement of a GPS device on Petitioner's vehicle, including the DNA later obtained from a cheek swab following Petitioner's arrest; and (2) appellate counsel failed to challenge on direct appeal the legality of the warrantless GPS device under *United States v. Jones*, 565 U.S. 400 (2012).

(b) Trial and appellate counsel failed to challenge the enhancement of Petitioner's sentence based upon Davidson County convictions that had not yet become final but were pending appeal at the time of his sentencing in Williamson County.

(c) Trial counsel failed to seek a change of venue due to the outsized publicity around the "Wooded Rapist" cases, which deprived him of his right to be tried by a fair and impartial jury.

(d) Trial counsel failed to file a proper motion to suppress the DNA evidence obtained as a result of Petitioner's unlawful arrest on May 1, 2008, which was effected pursuant to a 2006 capias warrant for the "John Doe" who matched a DNA profile attached to the warrant.

(e) Trial counsel filed an insufficient motion to suppress the fruits of an unlawful search conducted pursuant to a warrant issued on April 28, 2008.

10

(f) Trial counsel failed to argue as a mitigating factor at sentencing that Petitioner voluntarily released the victim alive, which Section 39-13-304(b)(2) of the Tennessee Code requires the sentencing court to consider as a mitigating factor.

(*See* Doc. No. 1 at 5–10, 16–18; Doc. No. 2 at 6, 7–79; Doc. No. 17.)

## V. ANALYSIS

A. Legal Standard

The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). A federal court may grant habeas relief to a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Upon finding a constitutional error on habeas corpus review, a federal court may only grant relief if it finds that the error "had substantial and injurious effect or influence" upon the conviction. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *Peterson v. Warren*, 311 F. App'x 798, 803–04 (6th Cir. 2009).

AEDPA was enacted "to reduce delays in the execution of state and federal criminal sentences, particularly in capital cases . . . and 'to further the principles of comity, finality, and federalism.'" *Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 436 (2000)). AEDPA's requirements "create an independent, high standard to be met before a federal court may issue a writ of habeas corpus to set aside state-court rulings." *Uttecht v. Brown*, 551 U.S. 1, 10 (2007) (citations omitted). As the Supreme Court has explained, AEDPA's requirements reflect "the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (quoting *Jackson v. Virginia*,

11

443 U.S. 307, 332 n.5 (1979)). Prior to the passage of AEDPA, district courts applied de novo review to determine whether "the relevant state court had erred on a question of constitutional law or on a mixed constitutional question." *Williams v. Taylor*, 529 U.S. 362, 402 (2000) (O'Connor, J., concurring). But now, where state courts have ruled on the merits of a claim, AEDPA imposes "a substantially higher threshold" for obtaining relief than a de novo review of whether the state court's determination was incorrect. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410).

Specifically, a federal court may not grant habeas relief on a claim rejected on the merits in state court unless the state decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2). The Supreme Court has repeatedly held "that AEDPA, by setting forth [these] necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court.'" *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quoting *Burt v. Titlow*, 571 U.S. 12, 19 (2013)).

A state court's legal decision is "contrary to" clearly established federal law under Section 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412–13. An "unreasonable application" under this subsection occurs when "the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *White v. Woodall*, 572 U.S. 415, 426

12

(2014). A state court decision is not unreasonable under this standard simply because the federal court, "in its independent judgment," finds it erroneous or incorrect. *Williams*, 529 U.S. at 411. Rather, to be actionable under Section 2254(d)(1), the state court's decision "'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *Woodall*, 572 U.S. at 419). An objectively unreasonable decision is one "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

Similarly, a district court on habeas review may not find a state court factual determination to be unreasonable under Section 2254(d)(2) simply because it disagrees with the determination. *Young v. Hofbauer*, 52 F. App'x 234, 237 (6th Cir. 2002). Rather, the determination must be "objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)) (internal quotation marks omitted). Moreover, a state court's factual determinations "shall be presumed to be correct" and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Davis v. Ayala*, 576 U.S. 257, 271 (2015) ("State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'") (quoting *Rice v. Collins*, 546 U.S. 333, 338–39 (2006)). Finally, the petitioner may not prevail under Section 2254(d)(2) simply by showing that a fact was unreasonably determined; he "must show that the resulting state court decision was 'based on' that unreasonable determination." *Rice v. White*, 660 F.3d 242, 250 (6th Cir. 2011).

13

AEDPA's standard for granting relief on a claim rejected on the merits by a state court "is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Richter*, 562 U.S. at 102, and *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)). This standard "was meant to be" a high hurdle for petitioners, consistent with the principle that habeas corpus functions as a guard against only "extreme malfunctions" in the state's administration of criminal justice. *Harrington*, 562 U.S. at 102; *see also Woods*, 575 U.S. at 316.

Review under AEDPA is not only demanding, but also ordinarily unavailable to state inmates who have not fully exhausted their remedies in the state court system. Title 28 U.S.C. Sections 2254(b) and (c) provide that, subject to certain exceptions, a federal court may not grant a writ of habeas corpus on behalf of a state prisoner unless the prisoner has presented the same claim sought to be redressed in a federal habeas court to the state courts. *Pinholster*, 563 U.S. at 182; *Kelly v. Lazaroff*, 846 F.3d 819, 828 (6th Cir. 2017) (quoting *Wagner v. Smith*, 581 F.3d 410, 417 (6th Cir. 2009)) (federal claim is exhausted if it was presented "under the same theory" in state court). This rule has been interpreted by the Supreme Court as one of total exhaustion, *Rose v. Lundy*, 455 U.S. 509 (1982), meaning that, as of the time of the habeas petition's filing, there can no longer be any available state remedy for any of its claims; if a state remedy is available for any habeas claim, the entire petition is subject to dismissal or, in limited circumstances, to stay and abeyance while the unexhausted claim is pursued in state court. *Rhines v. Weber*, 544 U.S. 269, 275–78 (2005). A habeas petition is thus fully exhausted if each and every claim was first fairly

presented to the state appellate court[3] as a federal constitutional claim in substance, if not explicitly. *See Gray v. Netherland*, 518 U.S. 152, 162–63 (1996); *Pillette v. Foltz*, 824 F.2d 494, 496 (6th Cir. 1987) (requiring the presentation of "the legal and factual substance of every claim to all levels of state court review").

However, because the exhaustion requirement "refers only to remedies still available at the time of the federal petition," it may also be "satisfied if it is clear that [the habeas petitioner's] claims are now procedurally barred under [state] law." *Gray*, 518 U.S. at 161 (citations and internal quotation marks omitted). The doctrine of procedural default is thus a corollary to the rule of exhaustion, one which ordinarily bars habeas review of claims that were not "fairly presented" for merits review in state court, either because they were presented in a way that failed to comport with state procedural rules or because they were not presented at all and no longer can be presented under state law. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (acknowledging "the interplay of these two doctrines" and stating that, to avoid an end-run around the exhaustion requirement and "the values that it serves," "we ask not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, i.e., whether he has fairly presented his claims to the state courts") (emphasis in original; internal citations and quotation marks omitted). If the state court decides a claim on "adequate and independent state grounds"— typically a procedural rule prohibiting the state court from reaching the merits of the constitutional claim—the claim will ordinarily be barred from federal habeas review because of its procedural default. *Wainwright v. Sykes*, 433 U.S. 72, 81–82 (1977*); see also Walker v. Martin*, 562 U.S. 307, 315 (2011) ("A federal habeas court will not review a claim rejected by a state court if the decision

---

[3]        In Tennessee, the Court of Criminal Appeals is the highest appellate court to which appeal must be taken in order to properly exhaust a claim. *See* Tenn. Sup. Ct. R. 39; *Adams v. Holland*, 330 F.3d 398, 402–03 (6th Cir. 2003).

15

of the state court rests on a state law ground that is independent of the federal question and adequate to support the judgment."); *Coleman v. Thompson*, 501 U.S. 722 (1991) (same). Likewise, if a claim has never been presented to the state courts, but a state-court remedy is no longer available (e.g., when an applicable statute of limitations bars a claim or state law deems the claim waived),[4] then the claim is technically (though not properly) exhausted but barred by procedural default. *Coleman*, 501 U.S. at 731–32.

If a claim is procedurally defaulted, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Id.* at 750. The burden of showing cause and prejudice to excuse defaulted claims is on the habeas petitioner. *Lucas v. O'Dea*, 179 F.3d 412, 418 (6th Cir. 1999) (citing *Coleman*, 501 U.S. at 754). "'[C]ause' under the cause and prejudice test must be something *external* to the petitioner, something that cannot fairly be attributed to him[,] . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule." *Coleman*, 501 U.S. at 753 (emphasis in original). Examples of cause include the unavailability of the factual or legal basis for a claim, interference by officials that makes compliance "impracticable," or attorney error that violates the right to counsel's effective assistance. *Id.* at 753–54. To establish prejudice, a petitioner "must show not merely a substantial federal claim, such that the errors at trial created a possibility of prejudice, but rather that the

---

[4]     The Tennessee Post-Conviction Procedure Act provides that "[i]n no event may more than one (1) petition for post-conviction relief be filed attacking a single judgment"; it then establishes a one-year statute of limitations for filing that one petition. Tenn. Code Ann. § 40-30-102(a) and (c). The Act further provides that "[a] ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented," unless that ground could not be presented due to unconstitutional state action, or is based on a new and retroactive constitutional right that was not recognized at the time of trial. *Id.* § 40-30-106(g).

constitutional violation worked to his actual and substantial disadvantage." *Shinn v. Ramirez*, 596 U.S. 366, 379–80 (2022) (citations and internal quotation marks omitted); *see also Ambrose v. Booker*, 684 F.3d 638, 649 (6th Cir. 2012) (finding that "having shown cause, petitioners must show actual prejudice to excuse their default"). "When a petitioner fails to establish cause to excuse a procedural default, a court does not need to address the issue of prejudice." *Simpson v. Jones*, 238 F.3d 399, 409 (6th Cir. 2000). Likewise, if a petitioner cannot establish prejudice, the question of cause is immaterial.

Because the cause and prejudice standard is not a perfect safeguard against fundamental miscarriages of justice, the United States Supreme Court has recognized a "narrow exception" to the bar of an unexcused default in cases where a constitutional violation has "probably resulted" in the conviction of one who is "actually innocent" of the substantive offense. *Dretke v. Haley*, 541 U.S. 386, 392–93 (2004) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)); *accord Lundgren v. Mitchell*, 440 F.3d 754, 764 (6th Cir. 2006). To obtain habeas review under this narrow exception to the procedural-default rule, the petitioner would need to demonstrate his factual innocence, not the mere legal insufficiency of the State's proof; a miscarriage-of-justice claim is not supported by an assertion of mere legal innocence. *Lee v. Brunsman*, 474 F. App'x 439, 442 (6th Cir. 2012) (citing *Bousley v. United States*, 523 U.S. 614, 623 (1998), and *Calderon v. Thompson*, 523 U.S. 538, 559 (1998)).

B. Claims to Relief

1. Claim 1: Sufficiency of the Evidence of Rape

Petitioner claims that the evidence that he used force or coercion against K.A., as required for his unlawful behavior to constitute rape under Tennessee law, was insufficient to support the jury's verdict beyond a reasonable doubt. He exhausted this claim on direct appeal before the

17

TCCA, which properly stated the applicable standard for adjudicating the sufficiency of the convicting evidence as whether any "reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *State v. Burdick*, 2013 WL 2642313, at \*9 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In accord with this standard, "a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Cavazos v. Smith*, 565 U.S. 1, 6 (2011) (quoting *Jackson*, 443 U.S. at 326)). Thus, a federal habeas court must resist substituting its own opinion for that of the convicting jury, *York v. Tate*, 858 F.2d 322, 329 (6th Cir. 1988), particularly when it comes to matters of witness credibility, which "is an issue to be left solely within the province of the jury." *Knighton v. Mills*, No. 3:07-cv-2, 2011 WL 3843696, at \*6 (E.D. Tenn. Aug. 29, 2011) (citing, *e.g.*, *Deel v. Jago*, 967 F.2d 1079, 1086 (6th Cir. 1992)).

In addition to this requirement of deference to the jury verdict concerning the elements of the crime under state law, this Court must defer to the TCCA's consideration of that verdict under AEDPA. *See Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (stating that "the law commands deference at two levels" when adjudicating sufficiency-of-the-evidence claim). Here, the TCCA described the statutory elements under consideration and analyzed the proof of those elements, as follows:

> Rape is defined as the "unlawful sexual penetration of a victim by the defendant or of the defendant ... [and f]orce or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-503(a)(1). "'Sexual penetration' means sexual intercourse ..., or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." Tenn. Code Ann. § 39-13-501(7). This court has previously stated that the term "unlawful" generally refers to non-consensual acts. *See State v. Jones*, 889 S.W.2d 225, 227 (Tenn. Crim. App. 1994). Specifically, the State charged the appellant with the vaginal rape of the victim. ...

18

The evidence, viewed in the light most favorable to the State, revealed that the victim was awakened when someone wearing fingerless gloves placed a hand over her eyes and told her to be quiet. The perpetrator led the victim, against her will, outside and away from the house to a wooded area. He covered her eyes with duct tape and told her to disrobe, get on the ground, and perform fellatio. Thereafter, the perpetrator put on a condom, got on top of the victim, and penetrated her vagina with his penis. He kissed her breasts during intercourse. When they heard a dog barking, the perpetrator guided the victim back to the house, removed the duct tape, and instructed her to delay calling the police. The victim's husband discovered that the motion lights underneath the deck had been loosened so that they would not come on. Ketner confirmed that he was walking his dog and saw the victim outside with an unidentified male. Testing revealed that a swab of saliva taken from the victim's breast contained the appellant's DNA. We conclude that the foregoing evidence was sufficient to sustain the appellant's convictions for rape and aggravated burglary.

*State v. Burdick*, 2013 WL 2642313, at *9.

Petitioner argues that the State failed to prove that his vaginal penetration of K.A. was accomplished by the use of force or coercion. He points out that he did not have a weapon, did not cover K.A.'s mouth or threaten her not to summon help, and that he neither "caused [n]or threatened to cause bodily harm to the victim or any member of her family." (Doc. No. 2 at 15.) "In fact," Petitioner continues, "under the circumstances it could be said that the victim voluntarily left the house with the perpetrator and willingly engaged in the sexual activity because she thought it would be safer and she did not want to wake her daughter." (*Id.*)

Petitioner's argument is specious. There is no evidentiary support whatsoever for Petitioner's suggestion that K.A. "willingly engaged" in intercourse with her kidnapper and assailant, without suffering any bodily harm. Indeed, using duct tape to cover a sexual assault victim's eyes can alone cause bodily harm. *See State v. Burdick*, No. M2009-02085-CCA-R3CD, 2012 WL 1366359, at *5 (Tenn. Crim. App. Apr. 18, 2012) (finding evidence sufficient to support aggravated rape conviction where use of duct tape on victim's eyes and wrists established aggravating factor of "bodily injury"). Here, K.A.'s testimony demonstrated that, after she was led

19

to a wooded area, had her eyes taped shut, and was ordered to disrobe, she submitted to unlawful sexual penetration because, as Petitioner suggests, she thought it would be safer for herself and her sleeping family members than calling for help or physically resisting. (Doc. No. 13-9 at 30–31.) K.A. further testified that "[t]here was implied violence" in the tone of Petitioner's command to her, prior to the vaginal rape, of "don't f**k it up." (*Id.* at 36.) The jury obviously credited this testimony, as it was their province to do. The evidence easily supports the finding that K.A. was responding to what she perceived as a "threat of . . . force or violence to be performed immediately or in the future"—the statutory definition of coercion, Tenn. Code Ann. § 39-13-501(1), as provided in the jury charge. (Doc. No. 13-4 at 64; Doc. No. 13-11 at 54.) The claim that such evidence is insufficient to support Petitioner's rape conviction is entirely without merit.

2. Claim 2: Sufficiency of the Evidence of Aggravated Kidnapping

Under Tennessee law, aggravated kidnapping is "the knowing removal or confinement of another unlawfully *so as to interfere substantially* with the other's liberty," Tenn. Code Ann. § 39-13-302(a) (emphasis added), when that removal or confinement is "committed . . . [t]o facilitate the commission of any felony or flight thereafter." *Id.* § 39-13-304(a)(1). Petitioner claims that his aggravated kidnapping conviction was not supported by sufficient evidence that he interfered substantially with K.A.'s liberty. The reason for this evidentiary insufficiency, according to Petitioner, is that his jury was not properly instructed (under *State v. White*, 362 S.W.3d 559 (Tenn. 2012)) that in order to find substantial interference for purposes of the crime of aggravated kidnapping, the interference must not be essentially incidental to the commission of the accompanying rape of K.A. Respondent treats this claim as both a sufficiency-of-the-evidence claim and a claim that Petitioner's federal due process rights were violated—the latter of which he argues cannot be reviewed here because it was not pursued in state court and thus was procedurally

20

defaulted. (*See* Doc. No. 14 at 22–34.) In an effort to avoid Respondent's assertion of procedural default, Petitioner has clarified in his Reply that he invoked "due process principles" in his Petition and Memorandum (Doc. No. 1 at 7; Doc. No. 2 at 20) *not* to assert an independent claim under the Due Process Clause of the federal constitution, but to highlight the concern that underlies *Jackson v. Virginia*'s sufficiency-of-evidence criterion[5] and its prohibition of "[a]ny conviction based upon evidence which is legally insufficient to support the jury verdict." (Doc. No. 17 at 12 (stating that his claim, "although asserting the application of the ruling in [*White*], is no more than an independent challenge to the sufficiency of the evidence regarding the sole offense of aggravated kidnapping"), 13–14.)

This presentation of Petitioner's claim echoes his presentation to the TCCA. In his appellate brief, Petitioner argued that, since the Tennessee Supreme Court's decision in *White*, the "key element" of aggravated kidnapping had been clarified, and the failure of the trial court properly to instruct the jury on that element rendered the evidence "insufficient as a matter of law to sustain the aggravated kidnapping conviction." (Doc. No. 13-16 at 26–27.) Petitioner therefore demanded that the aggravated kidnapping conviction "be vacated and dismissed." (*Id.*) Earlier in his appellate brief, Petitioner argued that, because his case was in the direct-appeal pipeline when *White* was decided, the absence of the *White* instruction required the overturning of the trial court's

---

[5]     *Jackson* determined that "the critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt"—i.e., whether "any rational trier of fact" could have found the crime's elements satisfied under that standard—when that evidence is viewed in the light most favorable to the prosecution. 443 U.S. at 318–19. This "criterion" is "required to enforce the due process right" of the accused, *id.* at 319 n.12, and "impinges upon jury discretion only to the extent necessary to guarantee the fundamental protection of due process of law." *Id.* at 319; *see also State v. Scott*, No. E2011-00707-CCA-R3CD, 2012 WL 5503951, at *13 n.3 (Tenn. Crim. App. Nov. 14, 2012) ("The use of the term of art 'sufficiency of the evidence' imports a mandate of due process such that, when the convicting evidence is legally insufficient, the charge is dismissed.") (citing *Jackson*, 443 U.S. at 324).

21

denial of his motion for new trial, so that he could be re-tried before a properly instructed jury. (*Id.* at 16–21.) These claims are legally distinct; they sought distinctly different relief—dismissal as a remedy for constitutionally insufficient evidence versus re-trial as a remedy for the erroneous jury charge. These distinctions matter.[6] A failure of the sufficiency of the convicting evidence is a lively claim for federal habeas purposes, while "the fact that [an] instruction was allegedly incorrect under state law is not a basis for habeas relief." *Estelle v. McGuire*, 502 U.S. 62, 71–72 (1991).

The TCCA ruled that the evidence was sufficient to support Petitioner's rape and aggravated burglary convictions. It further ruled that although "the same jury instruction error that attended . . . White's conviction exists here," that erroneous "jury instruction regarding aggravated kidnapping . . . was harmless" in light of the fact that "overwhelming" evidence supported that conviction. *State v. Burdick*, 2013 WL 2642313, at *12–13. In so ruling, the TCCA agreed with the trial court's justification for denying Petitioner's motion for new trial, explaining as follows:

> The proof at trial revealed that the appellant unscrewed the motion-activated lights outside the victim's residence, entered the victim's home, found her sleeping on the couch and her husband sleeping in another room, and woke her by placing his hand over her eyes and telling her to be quiet. With the implied threat of violence, he led her outside to a wooded area, away from her house and her family, where he taped her eyes shut, ordered her to undress, and forced her to perform fellatio and have intercourse. After being startled by a barking dog, he led the blindfolded victim back to her house and instructed her to wait before contacting police. We agree with the trial court that the proof was overwhelming that the removal and/or confinement of the victim went beyond that necessary to perpetrate the rape or the aggravated burglary. *See State v. Rochelle Bush*, No. W2011-02721-CCA-R3-CD, 2013 WL 1197859, at *7 (Tenn. Crim. App. at Jackson, Mar. 25, 2013); *State v. Jonathan Kyle Hulse*, No. E2011-01292-CCA-R3-CD, 2013 WL 1136528, at *14 (Tenn. Crim. App. at Knoxville, Mar. 19, 2013). Therefore, we conclude that the error "did not contribute to the verdict obtained" and was harmless beyond a reasonable doubt. [*State v.*] *Rodriguez*, 254 S.W.3d [361, 371 (Tenn. 2008)].

*Id.* at *13.

---

[6]     Indeed, as the TCCA has noted, "[t]he grant of a new trial could *never* be the disposition of a question on the sufficiency of the evidence." *Scott*, 2012 WL 5503951, at *13 n.3 (emphasis added).

The TCCA's harmless-error ruling undoubtedly qualifies as an adjudication on the merits of his sufficiency-of-the-evidence claim under AEDPA. *See Brown v. Davenport*, 596 U.S. 118, 127 (2022). Petitioner argues that the TCCA's decision was flawed, because if a jury is not properly charged that the substantial-interference element of aggravated kidnapping cannot be essentially incidental to any accompanying felony, then it follows that the jury could not "determine whether sufficient evidence exists to support a verdict of guilty" on the aggravated kidnapping charge. (Doc. No. 17 at 15.) But "improperly instructing the jury on an element of the offense [is] an error which is subject to harmless-error analysis." *Neder v. United States*, 527 U.S. 1, 10 (1999) (citation omitted). And, in any event, the issue before this Court is whether the TCCA's decision—that "overwhelming" evidence established that the interference with K.A.'s liberty "went beyond that necessary to perpetrate the rape"—was an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d). The fact that the state courts failed to order a new trial to correct a defect highlighted by an intervening Tennessee Supreme Court decision does not bear on that issue.

In *Alston v. Genovese*, No. 20-5038, 2020 WL 3960581 (6th Cir. June 9, 2020), the Sixth Circuit reviewed a claim that "there was not an instruction to ask the jury to determine whether the victim's removal [and confinement] was incidental to the accompanying felony [of aggravated robbery], and, [s]ince the jury was not given an opportunity to make this determination, the State court made an unreasonable determination of the facts when it ruled that [he] was not prejudiced as a result." *Id.* at *2 (internal quotation marks omitted). The court recognized that a defective jury instruction could warrant habeas relief if it "so infected the entire trial that the resulting conviction violates due process." *Id.* (quoting *Estelle*, 502 U.S. at 72). But because the proof in the case before it established clear separation between the commission of the kidnapping and the commission of

23

the other felony offense, and because a state court's finding "that 'the absence of a *White* instruction was harmless beyond a reasonable doubt' is entitled to significant deference on habeas review," the Sixth Circuit found that reasonable jurists could not debate the district court's conclusion that no constitutional violation occurred. *Id.* (citing *Davis v. Ayala*, 135 S. Ct. 2187, 2198 (2015)); *cf. also Roberson v. Eller*, No. 3:21-CV-305-TAV-JEM, 2024 WL 3370523, at *12 (E.D. Tenn. July 10, 2024) (finding that TCCA's reliance on proof of victim's restraint "that was clearly beyond what was necessary to accomplish the accompanying [rape and robbery]" was not an unreasonable determination of the facts, did not ignore any due process-threatening impact of jury's failure to receive *White* instruction, and was grounds for denying petitioner's claim of insufficiency of the evidence of aggravated kidnapping).

Likewise, the TCCA's harmless-error finding in Petitioner's case was not based on an unreasonable determination of the facts under 28 U.S.C. § 2254(d)(2). Citing Section 2254(d)(1), Petitioner argues that the TCCA acted contrary to federal law in finding that the lack of a *White* instruction was harmless error without applying the standard for harmless-error review established in *Chapman v. California*, 386 U.S. 18 (1967). (*See* Doc. No. 17 at 19.)[7] But the TCCA *did* apply that standard when it cited *Rodriguez*, 254 S.W.3d at 371, and "conclude[d] that the error 'did not contribute to the verdict obtained' and was harmless beyond a reasonable doubt." *State v. Burdick*, 2013 WL 2642313, at *13. *Rodriguez* referred to *Neder*, 527 U.S. at 15, which applied the *Chapman* test to determine that a nonstructural constitutional error was harmless. *Neder*, *supra* at 17 ("We think it beyond cavil here that the error 'did not contribute to the verdict obtained.'" (quoting *Chapman*, *supra* at 24)). Because it "properly identified the controlling standard" and

---

[7]     "A state court decision is 'contrary to' established federal law if the state court arrived at a conclusion opposite to one reached by the Supreme Court on a question of law or if it decides a case differently than the Supreme Court on materially indistinguishable facts." *Ruelas v. Wolfenbarger*, 580 F.3d 403, 408 (6th Cir. 2009).

proceeded to find harmlessness beyond a reasonable doubt under that standard, the TCCA's decision was not contrary to federal law. *Brown*, 596 U.S. at 144.

In sum, Petitioner is not entitled to habeas relief on this claim.

3. Claim 3: Ineffective Assistance of Counsel

A claim of ineffective assistance of counsel arises under the Sixth Amendment and is properly analyzed under the two-prong standard of *Strickland v. Washington*, 466 U.S. 668 (1984), which asks: (1) whether counsel was deficient in representing Petitioner; and (2) whether counsel's alleged deficiency prejudiced the defense so as to deprive Petitioner of a fair trial. *Id.* at 687. To meet *Strickland*'s first prong, Petitioner must establish that his counsel's representation "fell below an objective standard of reasonableness," and must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, [he] must overcome the presumption that . . . the challenged action 'might be considered sound trial strategy.'" *Id.* at 688–89 (quoting *Michel v. State of La.*, 350 U.S. 91, 101 (1955)). The "prejudice" component of the claim "focuses on the question of whether counsel's deficient performance renders the result of the . . . proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). It requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

When an exhausted claim of ineffective assistance of counsel is raised in a federal habeas petition, review under AEDPA is "doubly deferential," *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009), in that "*Strickland* requires deference to counsel and AEDPA requires deference to the state court." *Moody v. Parris*, No. 20-5299, 2022 WL 3788503, at *4 (6th Cir. Aug. 30, 2022).

25

The question then is not whether Petitioner's counsel was ineffective; rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011).

Petitioner's ineffective-assistance claim was properly exhausted only to the extent of his arguments in Claim 3(a)—that trial and appellate counsel failed to challenge evidence gleaned as a result of the warrantless placement of a GPS device on Petitioner's vehicle, including the DNA later obtained from a cheek swab following Petitioner's arrest; and Claim 3(b)—that trial counsel failed to challenge the enhancement of Petitioner's sentence based upon Davidson County convictions that had not yet become final but were pending appeal at the time of his sentencing in Williamson County. The TCCA applied the *Strickland* standard to these claims, *see Burdick v. State*, 2021 WL 2499313, at *4, as described below.

a. Claim 3(a) – Warrantless GPS Tracking

First, with respect to the ineffective-assistance claim concerning GPS tracking, the TCCA found as follows:

> The Petitioner argues that both trial and appellate counsels rendered ineffective assistance for failing to challenge law enforcement's placement of a GPS tracking device on his vehicle without a warrant, "which ultimately led to his arrest and the taking of his DNA sample resulting in his conviction."
>
> In support of his argument, the Petitioner points out that while his case was in the appellate pipeline, the United States Supreme Court issued its opinion in <u>Jones</u>, 565 U.S. 400, holding that the attachment of a GPS tracking device to a defendant's vehicle constituted a search within the meaning of the Fourth Amendment thus necessitating a warrant. He claims that counsel should have challenged his arrest "based upon an unreasonable seizure of his person stemming from an illegal search" and sought to suppress "all evidence obtained from [his] person, his vehicle and his home as fruits of an unconstitutional search and seizure." He also contends that "once law enforcement lost sight [of him] visually, ... law enforcement relied upon the GPS device to locate [him] ... and did initiate a 'stop' of the vehicle and effect an 'arrest' of his person without a warrant."

26

At the post-conviction hearing, [Attorney Ausbrooks, counsel for Counts 12, 13, and 14] testified that she and the Petitioner discussed the issue about the GPS device being placed on his vehicle. She knew that <u>Jones</u> was in the appellate pipeline and was aware of its ramifications. She spoke with Captain O'Neil and another detective, as well as reviewed the discovery, before advising the Petitioner that she would not file an additional motion to suppress based on <u>Jones</u>. She explained that it was her opinion that there was no legal basis to proceed with such motion because the DNA evidence had been obtained prior to the GPS device being attached to his car, and no evidence had been obtained as a result of the GPS device. Counsel noted that she had already filed and litigated a motion to suppress regarding the search warrant and warrantless arrest, but after her investigation she did not believe there was a basis to proceed with a motion to suppress based upon the GPS tracker, and she had an ethical duty not to file a frivolous motion.

In ruling on this issue, the post-conviction court found that there was not an ethical basis for counsel to file a motion to suppress based on the GPS tracking device "because there was in fact no legal or factual connection between the GPS tracking and the DNA evidence.... Consequently, ... the Petitioner has failed to show that [counsel's] performance fell below the standard required for criminal defense attorneys."

The Petitioner's argument disregards the fact that no information or evidence was gathered as a result of the tracking device. The police had already obtained the Petitioner's DNA from utensils that he had used at a restaurant before the device was installed on his vehicle, and the DNA on those items matched the DNA collected of the unknown suspect in multiple rapes in Williamson and Davidson Counties. Evidence of the Petitioner's DNA was not fruit of the poisonous tree as the police had already obtained the sample before attaching the device to his vehicle. We determine that neither trial nor appellate counsel rendered deficient performance by failing to raise what would have been a frivolous claim. In addition, the Petitioner has not established prejudice because none of the evidence used to secure his arrest and convictions arose from the tracking device.

*Id.* at *5–6.

Petitioner claims "that law enforcement's placement of the GPS tracking device on his vehicle without a warrant while monitoring his every movement for a period of three (3) days constituted an unreasonable search," and that his subsequent arrest and buccal swab for DNA evidence is the fruit of that unreasonable search. (Doc. No. 17 at 24–25.) However, as Petitioner himself concedes, these subsequent events also followed the return of "DNA testing . . . on the eating utensils from Tee Gee's Restaurant" (Doc. No. 2 at 37), where he had been tracked by *visual*

27

surveillance according to the post-conviction testimony of Captain O'Neil. (Doc. No. 13-32 at 22–23.) Thus, even if the warrantless placement of the GPS device could reasonably have been argued to be unlawful, counsel could not reasonably have believed that a motion to suppress the post-arrest DNA evidence would have succeeded, because that later evidence (obtained via buccal swab) was not the fruit of the GPS data; rather, as found by the TCCA, it was the fruit of the match between DNA left by the John Doe rape suspect and the DNA Petitioner left on his restaurant utensils, which was collected and submitted for analysis after law enforcement visually tracked Petitioner to the restaurant, without the use of GPS data. *Compare United States v. Kelly*, No. 17-5110, 2017 WL 7310402, at *2 (6th Cir. Nov. 14, 2017) (rejecting argument based on allegedly unlawful search of defendant's workplace, "because no contraband was found at [his] workplace, and thus the search of his workplace had no effect on his conviction") (citing, *e.g.*, *United States v. Smith*, No. 13–5258 (6th Cir. Apr. 30, 2014) (order) (finding defendant's argument that the district court erred in denying his pretrial motion to suppress the fruits of an allegedly illegal search to be moot because no evidence from the search was used at trial)).

The record supports the TCCA's finding that the buccal-swab DNA evidence ultimately used against Petitioner at trial was secured because of his DNA identification using a previously collected sample.[8] At a minimum, the record supports the finding that the DNA evidence was not secured as a result of illegal monitoring of his location. But even if the opposite were true, and law enforcement's use of ill-gotten location data allowed (by domino effect) for the collection of DNA evidence, it is not likely that the nexus between the means used to locate Petitioner and the DNA

---

[8]      As Petitioner highlights in his Reply (Doc. No. 17 at 31), Captain O'Neil testified at Petitioner's post-conviction evidentiary hearing that the DNA collected from the utensils provided probable cause for the search warrant used to obtain the buccal swab samples, which in turn yielded the DNA evidence introduced against Petitioner at trial. (Doc. No. 13-32 at 31–32.)

evidence obtained from him two days later would have been found close enough to warrant exclusion of the DNA evidence as fruit of the poisonous tree. *See United States v. Williams*, 615 F.3d 657, 668–69 (6th Cir. 2010) (noting that "[t]he Supreme Court has explained . . . that not all evidence must be suppressed simply because it would not have come to light but for the illegal actions of the police"; rather, courts must inquire whether connection between illegality and evidence is attenuated by lack of temporal proximity, presence of intervening circumstances, and lack of purposeful or flagrant police misconduct) (citations omitted)); *see also United States v. Chavez-Chavez*, No. 07CR1408 WQH, 2008 WL 1847229, at *8 (S.D. Cal. Apr. 22, 2008) (stating that "[t]he nexus between the original illegality and the specific evidence subject to challenge must be a close one[;] . . . [i]t is not sufficient to demonstrate taint that . . . an illegal search uncovers the alleged perpetrator's identity and therefore directs [law enforcement's] attention to [him]"). Thus, it is clear that Petitioner was not prejudiced as a result of the unchallenged use of GPS monitoring without a warrant.

In sum, the TCCA reasonably determined that counsel was not deficient in failing to challenge (in either the trial or appellate courts) the warrantless use of GPS tracking, and that Petitioner was not prejudiced thereby. Petitioner's claim to the contrary is without merit.

b. Claim 3(b) – Sentence Enhancement

Next, as to Petitioner's ineffective-assistance claim related to sentence enhancement, the TCCA found as follows:

> The Petitioner asserts that counsel rendered ineffective assistance for failing to challenge the trial court's enhancement of his sentence based on "prior convictions" that "were nothing more than the first convictions handed down in a series of jury trials stemming from a 13-count indictment in Davidson and Williamson Counties." He notes that the trial court used his Davidson County convictions for attempted aggravated rape and especially aggravated kidnapping to enhance his sentence based on prior criminal conduct, and he acknowledges that he was convicted in this case after he was convicted for the Davidson County rapes.

29

However, he asserts that because he had not committed new crimes or served time for the Davidson County convictions at the time of his arrest, he did not have a previous history of criminal convictions.

This court has previously held that "trial courts can consider criminal convictions or any other criminal behavior which occurred prior to the sentencing hearing as being 'a previous history of criminal convictions or criminal behavior' under Tenn. Code Ann. § 40-35-114(1), regardless of whether the convictions or behavior occurred before or after the criminal conduct under consideration." State v. Jordan, 116 S.W.3d 8, 24 (Tenn. Crim. App. 2003) (internal quotation omitted). ... According to the Petitioner's presentence report, the criminal acts committed in Davidson County took place prior to the Petitioner's sentencing in the present cases. We, therefore, conclude that counsel was not ineffective for failing to challenge the application of this enhancement factor.

In his reply brief, the Petitioner additionally asserts that because the Davidson County convictions had not become final and that appeal was pending at the time he was sentenced on the Williamson County convictions, those convictions could not be used to enhance his sentence. The Petitioner cites cases from Texas and Louisiana as persuasive authority for this supposition. This angle still does not entitle the Petitioner to relief. The trial court could have enhanced the Petitioner's sentence based on prior criminal convictions or criminal behavior, *see* Tenn. Code Ann. § 40-35-114(1), and the Petitioner's activities in Davidson County could certainly qualify as criminal behavior. Thus, there was no prejudice caused by counsel's not challenging the trial court's enhancement of his sentence based on "prior convictions."

*Burdick v. State*, 2021 WL 2499313, at *5.

Petitioner claims again in this Court that the prior convictions upon which the sentencing court relied had not yet become final at the time of his sentencing, that the reliance upon them to enhance his sentence was therefore unlawful, and that his counsel performed deficiently in failing to raise this challenge. Petitioner concedes that the trial court could properly have enhanced his sentence based on the criminal behavior which led the juries in his prior cases to convict him, but he argues that the applicable statute, Section 40-35-114(1) of the Tennessee Code, requires the court to enhance based on either prior (final) criminal convictions or prior criminal behavior; that "[t]he trial court in this case chose to apply previous history of convictions over behavior"; and that the court was bound by that choice and the erroneous sentence it produced. (Doc. No. 17 at

30

37–41; *see also* Doc. No. 2 at 57 ("The trial judge chose specifically criminal *convictions*, and is now bound by that choice." (emphasis in original)).)

Even if Petitioner's position regarding the operation of Section 40-35-114(1)—*i.e.*, that an enhancement under that section which is explicitly based only on prior "convictions" must stand or fall based on the finality of those convictions at the time of sentencing, without considering any underlying criminal behavior—were defensible under Tennessee law (and he has offered no authority, nor can the Court find any, to suggest that it is), the TCCA's rejection of his federal constitutional claim for failure to demonstrate prejudice was clearly reasonable. In short, because it is undisputed that the trial court could have applied Section 40-35-114(1) to enhance Petitioner's sentence based on his prior criminal "behavior," irrespective of the finality at that time of any resulting convictions, Petitioner cannot establish that counsel's failure to challenge the enhancement prejudiced him under *Strickland*—which requires a "reasonable probability" that "the result of the proceeding would have been different" but for counsel's failure. 466 U.S. at 694. Notably, any error in explicitly identifying only prior convictions and not prior behavior as a basis for enhancement under Section 40-35-114(1) would, if challenged, have been easily corrected on *de novo* review, without producing a different result. *See State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15–16 (Tenn. Crim. App. Mar. 20, 2024) (noting that the "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 [Sentence Reform] Act, as amended in 2005," and affirming trial court's sentence that properly considered sentencing principles, despite a technical error in the expression of its decision) (citation omitted). This claim has no merit.

31

### c. Claim 3(c) – Failure to Seek Change of Venue

In Claim 3(c), Petitioner asserts that trial counsel was ineffective in failing to seek a change of venue from Williamson County, in order to ensure that Petitioner received a fair trial by an impartial jury. Petitioner concedes that he procedurally defaulted Claim 3(c), as well as all other remaining ineffective-assistance claims, by failing to raise them on post-conviction review.

Because there is no longer any available state court remedy for these claimed violations, *see* Tenn. Code Ann. § 40-30-102(a), (c) (limiting availability of post-conviction relief to "the filing of only one (1) petition," and that within one year of final judgment), the claims are technically exhausted, but procedurally barred from habeas review unless Petitioner "can demonstrate cause for the default and actual prejudice" from the claimed violations, or that a fundamental miscarriage of justice will result if this Court does not consider them. *Coleman*, 501 U.S. at 731–32, 750.

Petitioner asserts the ineffective assistance of his post-conviction counsel as cause for the procedural default of his remaining claims. (*See* Doc. No. 2 at 64, 79–82.) The Supreme Court has "explained clearly that 'cause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him." *Coleman*, 501 U.S. at 753. Attorney error is attributable to a habeas petitioner, and thus may not serve as cause for a procedural default, if the error is made at a stage of the proceedings when there is no right to counsel under the Sixth Amendment. *Id.* at 754. The Supreme Court held in *Coleman* that, because there is no constitutional right to counsel in state post-conviction proceedings, any attorney error at that stage that leads to the waiver of claims in state court "cannot constitute cause to excuse the default in federal habeas." *Id.* at 752, 757.

32

However, in *Martinez v. Ryan*, 566 U.S. 1 (2012), the Supreme Court modified "the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default," "by recognizing a narrow exception: Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial." *Id.* at 9. This exception stems from the recognition, "as an equitable matter, that the initial-review collateral proceeding, if undertaken without counsel or with ineffective counsel, may not have been sufficient to ensure that proper consideration was given to a substantial claim" of trial counsel's ineffectiveness, when that claim could not have been raised on direct appeal because of state procedural rules. *Id.* at 13. In *Trevino v. Thaler*, 569 U.S. 413 (2013), the Supreme Court extended the applicability of the *Martinez* exception to states with procedural frameworks that do not technically preclude an ineffective-assistance claim on direct appeal, but make it unlikely that the opportunity to raise that claim at that time will be a meaningful one. *Id.* at 429. The Sixth Circuit then held in *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. 2014), that under Tennessee's procedural scheme, the initial post-conviction proceeding is the first meaningful opportunity to raise a claim of ineffective assistance of trial counsel. *Id.* at 795–96.

Thus, for each defaulted claim of ineffective assistance at trial, Petitioner may overcome the default under *Martinez* if he can show that the default resulted from his initial post-conviction counsel's ineffectiveness under *Strickland*'s standards, and that the underlying claim of trial counsel's ineffectiveness is a "substantial one, which is to say that . . . the claim has some merit." *Martinez*, 566 U.S. at 13–14. The Sixth Circuit has provided the following framework to evaluate claims under *Martinez*:

> As to these claims, the district court should determine . . . : (1) whether state post-conviction counsel was ineffective, . . . and (2) whether [Petitioner's] claims of

ineffective assistance of counsel were "substantial" within the meaning of *Martinez*, *Sutton*, and *Trevino*. Questions (1) and (2) determine whether there is cause. The next question is (3) whether [Petitioner] can demonstrate prejudice. Finally, the last step is: (4) if the district court concludes that [Petitioner] establishes cause and prejudice as to any of his claims, the district court should evaluate such claims on the merits. . . . [E]ven "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief. It merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Martinez*, 132 S. Ct. at 1320.

*Atkins v. Holloway*, 792 F.3d 654, 660 (6th Cir. 2015) (some internal citations omitted).

Whether post-conviction counsel was constitutionally ineffective is necessarily connected to the strength of the claim he failed to raise, so "in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was 'substantial' enough to satisfy the 'actual prejudice' prong of *Coleman*." *Thorne v. Holloway*, No. 3:14–cv–0695, 2014 WL 4411680, at *23 (M.D. Tenn. Sept. 8, 2014), *aff'd sub nom. Thorne v. Lester*, 641 F. App'x 541 (6th Cir. 2016).

Here, Petitioner argues that post-conviction counsel performed deficiently by failing to raise the claim that trial counsel's failure to seek a change of venue constituted ineffective assistance. But, as Respondent points out and Petitioner concedes (*see* Doc. No. 17 at 43), the post-conviction attorney initially appointed to represent Petitioner, Mr. Neil Campbell, *did* present this change-of-venue claim during initial post-conviction proceedings, in the Amended Petition for Post Conviction Relief filed on August 11, 2014. (Doc. No. 13-25 at 13 ("adopt[ing] and incorporat[ing]" the assertion of this claim in Petitioner's original, pro se petition).) The State's Response to Post-Conviction Petition, filed on September 16, 2014, responded to this claim by inviting the post-conviction court "to review the jury selection in this [case]," which "demonstrate[d] that the parties were able to select a jury with no preconceived ideas about the

34

petitioner's guilt and that the trial court carefully, and outside the presence of the venire, questioned those who might have heard something about the case or were biased."[9] (Doc. No. 13-26 at 33.) The State also noted (*id.* at 33 & n.1) that a motion to change venue had been made and denied prior to Petitioner's first Williamson County trial. *See Burdick v. Frink*, No. 3:21-cv-00602, Doc. No. 15-7 at 1–18 (M.D. Tenn.).[10]

After Mr. Campbell was permitted to withdraw, Petitioner retained a new post-conviction attorney, Mr. Douglas Trant. (Doc. No. 13-27 at 59–62.) Mr. Trant then filed an additional "Amendment to Petition for Post-Conviction Relief" in both Williamson County post-conviction cases on August 8, 2018 (Doc. No. 13-29 at 30–34), for the purpose of adding a claim of trial court error related to admission of unlawfully seized DNA evidence. (*Id.* at 30.) Both Mr. Trant and Petitioner certified that the amendment did not supplant, but "added to" the existing post-conviction petition. (*Id.* at 32–33.)

At the November 26, 2019 post-conviction evidentiary hearing, Mr. Trant called Petitioner as his only witness and focused his examination on "a couple of the issues that [he] raise[d] in that Post Conviction [Petition]," namely, the ineffective-assistance claims related to GPS tracking and sentence enhancement (denominated above as Claims 3(a) and 3(b)). (Doc. No. 13-32 at 8.) Otherwise, Mr. Trant briefly referred the court to "the pleadings" and "the petition" in submitting his case to the court. (*Id.* at 6, 49.) The trial court denied post-conviction relief in a ruling from the

---

[9] The trial transcripts were admitted into evidence upon a joint motion at the post-conviction hearing, because the post-conviction judge was not the judge who presided at Petitioner's trial. (*See* Doc. No. 13-32 at 5–6.)

[10] Indeed, although counsel in the Williamson County case at issue here did not renew prior counsel's motion to change venue, review of the transcript reveals that she succeeded in having the Motion for Change of Venue (along with the Motions to Suppress Fruits of Warrantless Seizure and to Suppress Fruits of Invalid Search Warrant) and the trial court's ruling after hearing the matter on August 12, 2009, incorporated into the instant record of proceedings. (*See* Doc. No. 13-4 at 41–42, 79–81; Doc. No. 13-2 at 2–7 and attachments.)

35

bench, announcing its decision that Petitioner had "failed to show that Ms. Ausbrooks' representation of him was deficient in any respect[,] [m]uch less, in particular with respect to the two issues he raises, sentencing enhancement consideration and the not filing a Motion to Suppress related to the GPS tracking." (*Id.* at 55.) The trial court's oral ruling was subsequently incorporated into a written "Order Dismissing Post-Conviction Petition," filed on December 11, 2019. (Doc. No. 13-30 at 48.) The order announced that the "cause came before the Court . . . on [Petitioner's] Petition and Amended Petitions for Post-Conviction Relief" on November 26, 2019, when "Petitioner raised two issues during the hearing," neither of which supported relief. (*Id.*) Petitioner expressly waived his right to an appointed post-conviction appellate attorney (*id.* at 117–120) and appealed this decision *pro se*, raising only these two issues upon which Mr. Trant focused during the hearing. (*See* Doc. No. 13-34 at 7.)

It is not at all clear to this Court that Claim 3(c) was defaulted because Petitioner received the ineffective assistance of counsel on *initial* post-conviction review—as required to trigger *Martinez*'s exception, *see Rogers v. Mays*, 69 F.4th 381, 395–96 (6th Cir. 2023)—rather than because Petitioner failed to raise the claim on post-conviction appeal. The TCCA would certainly have had jurisdiction to consider any issues that were "formally raised in the post-conviction petition or an amendment." *Lowe v. State*, No. M2022-01490-CCA-R3-PC, 2024 WL 2874148, at *10 (Tenn. Crim. App. June 7, 2024) (citation omitted). Had Claim 3(c) been raised on post-conviction appeal, the TCCA may well have found the claim waived because Petitioner (through counsel) did not develop it at the evidentiary hearing. But that outcome is by no means inescapable, particularly because the claim was not just raised in Petitioner's pleadings but argued by both parties in their pre-hearing filings, by reference to evidence of prejudice as demonstrated by the

36

Case 3:22-cv-00031    Document 18    Filed 03/24/25    Page 36 of 47 PageID #: 2981

sufficiency (or lack thereof) of voir dire.[11] *Cf. Sexton v. State*, No. M2023-00320-CCA-R3-PC, 2024 WL 1617907, at *12 (Tenn. Crim. App. Apr. 15, 2024), *app. denied* (Tenn. Aug. 14, 2024) (finding ineffective-assistance claim waived "because Petitioner did not raise this issue in any of his petitions or argue the issue at the post-conviction hearing"); *cf. also Middlebrooks v. Carpenter*, 843 F.3d 1127, 1140 (6th Cir. 2016) (finding that ineffective-assistance claims raised in an initial post-conviction petition but not supported by proof at evidentiary hearing were not defaulted at initial review and thus "not saved by *Martinez-Trevino*," though "[s]ignificantly," the order denying post-conviction relief included a catch-all finding that such claims were "without merit" because they were "grounds upon which no proof was offered"); *Myers v. Fisher*, No. 3:22-CV-29-KAC-DCP, 2023 WL 3467746, at *8 (E.D. Tenn. May 15, 2023) (finding, in case where venue issue was presented in the pro se post-conviction petition but counsel stated at the hearing that he "would not be addressing the venue issue" at that time, that default could be attributed to counsel to the extent that counsel's statement "may be interpreted as a waiver of the issue (as opposed to a decision not to present proof on the issue)"). Then, in its oral ruling, the post-conviction court stated that Petitioner had "failed to show that Ms. Ausbrooks' representation of him was deficient in any respect"; in its written ruling, the court referred to Petitioner's written filings as "before the Court" before focusing on the two claims explicitly asserted at the hearing. There is at least a plausible argument that Claim 3(c) was not only raised in the post-conviction trial court but denied by that court *sub silentio*. If Claim 3(c) was not defaulted until Petitioner failed to include it on

---

[11]    *See* Doc. No. 13-23 at 109 ("The Petitioner contends that the actual jurors that sat on his trial and rendered a verdict, were never actually challenged or properly voir dired by trial counsel, were never questioned in chambers by the trial court (at the request of trial counsel) regarding any pretrial exposure and general knowledge about the case and the facts, evidence or, the fact that the Petitioner had already been tried and convicted and what, if any opinion had been formed by those jurors."); Doc. No. 13-26 at 33 (arguing that transcript shows that "the parties were able to select a jury with no preconceived ideas about the petitioner's guilt and that the trial court carefully, and outside the presence of the venire, questioned those who might have heard something about the case or were biased").

post-conviction appeal, then *Martinez* does not apply, and Petitioner makes no other attempt to show cause for the default of his ineffective-assistance claim based on the failure to challenge venue.

Regardless, Claim 3(c) does not present a substantial claim of trial counsel's ineffectiveness. Petitioner argues that effective counsel would have moved to change venue because "securing a 'fair trial' in Williamson County[] was a virtual impossibility because it would be impossible to seat a jury who did not know about the case already, and had already been pre-exposed to extraneous, prejudicial outside influences" from the extensive media coverage of Petitioner's arrest and prior trials in Davidson County. (Doc. No. 2 at 60–61.) But a motion to change venue on account of the level of pretrial publicity had been heard and denied in the leadup to Petitioner's first Williamson County trial, and there is nothing to suggest that a renewed motion by defense counsel prior to the second trial would have been received any differently. As the TCCA has said:

> "[E]xtensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial unconstitutionally unfair," and the court may not presume unfairness based solely upon the quantity of publicity "in the absence of a 'trial atmosphere ... utterly corrupted by press coverage.'" *Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977) (further citations omitted). Corruption of the trial atmosphere can result from inflammatory publicity immediately before trial or from the influence of the news media pervading the proceedings "either in the community at large or in the courtroom itself." *Murphy* [*v. Florida*], 421 U.S. [794,] at 798–99, 95 S.Ct. at 2035 [(1975)]. On the other hand, the court will not presume that the jury's exposure to news reports regarding the defendant's prior convictions or the charged offense without more deprives the defendant of due process. *Id.* at 799, 95 S.Ct. at 2036.

*State v. Crenshaw*, 64 S.W.3d 374, 387 (Tenn. Crim. App. 2001).

Here, although Petitioner asserts that "[r]eports of DNA matches had been announced" in reporting on his prior trials (Doc. No. 2 at 61), this information "corresponds to the testimony [and forensic evidence] given at [Petitioner's] trial," *Crenshaw*, 64 S.W.3d at 387, and hence is not

38

prejudicial. During voir dire, the trial court questioned the venire about their exposure to publicity around the case, and some of the veniremen responded that they had seen, heard, or read something about the case. (Doc. No. 13-8 at 21–22.) Those who responded affirmatively were sequestered and examined, and six were excused for cause while four were retained. Of the four retained veniremen, three were struck, leaving one member of the jury who confessed exposure to pretrial publicity about the case. (*Id.* at 23–147.) Petitioner's contention that the above protocols were not followed (Doc. No. 2 at 63) is not supported by the record.

In adjudicating a challenge to venue based on pretrial publicity, "[t]he test is whether the jurors who actually sat and rendered verdicts were prejudiced by the pretrial publicity." *Crenshaw*, 64 S.W.3d at 386 (citation and internal quotation marks omitted). Petitioner has not made a credible showing that any member of his jury was so prejudiced. Accordingly, this ineffective-assistance claim is insubstantial, and its default unexcused.

### d. Claim 3(d) – Failure to Move to Suppress Based on Unlawful Arrest

Petitioner claims that trial counsel failed to file a proper motion to suppress the DNA evidence obtained as a result of his unlawful arrest on May 1, 2008, which was effected pursuant to a 2006 capias warrant for the "John Doe" who matched a DNA profile attached to the warrant. This claim is procedurally defaulted. In attempting to overcome the default, Petitioner argues that *Martinez* applies, and that post-conviction counsel was deficient in failing to raise this claim of trial counsel's ineffectiveness because there was no probable cause to believe that Petitioner was the John Doe suspect. (*See* Doc. No. 2 at 64–67; Doc. No. 17 at 42.)

As discussed above, this claim too was raised by Attorney Campbell early in the post-conviction proceedings (Doc. No. 13-27 at 31) and responded to by the State (Doc. No. 13-29 at 53) but not addressed on the merits by the post-conviction trial court or asserted on post-conviction

appeal. As explained with regard to Claim 3(c), the Court is not confident that *Martinez* applies to Claim 3(d). But even if it does, this ineffective-assistance claim is plainly not substantial. "To be substantial, an ineffective-assistance-of-trial-counsel claim must, among other things, be supported by evidence." *Rogers*, 69 F.4th at 396 (citing *Martinez*, 566 U.S. at 15–16). Petitioner does not assert any evidentiary support for Claim 3(d); he merely asserts, in conclusory fashion, that "[a]t the time of []his arrest, there was no probable cause to believe that the Petitioner was the "John Doe" alleged in the [2006 capias warrant]." (Doc. No. 1 at 17; *see also* Doc. No. 2 at 64–67.) Moreover, as the State argued in its written response to this claim before the post-conviction court, "[t]he Tennessee Supreme Court addressed the 'John Doe' arrest in this case and found no error." (Doc. No. 13-29 at 53.) Indeed, in *State v. Burdick*, 395 S.W.3d 120 (Tenn. 2012), the Tennessee Supreme Court took up the question of whether the John Doe warrant identifying Petitioner's unique DNA profile was sufficient to commence the criminal prosecution against him and, once a superseding indictment was filed in Petitioner's name, to satisfy his constitutional right to notice of the charge against him. In a unanimous decision, the Tennessee Supreme Court answered that two-part question in the affirmative and affirmed Petitioner's Davidson County conviction for attempted aggravated rape. *Id.* at 121–22, 130. Accordingly, Claim 3(d) is not substantial under *Martinez*.

e. Claim 3(e) – Failure to Adequately Move to Suppress Based on Unlawful Search

In this claim, Petitioner asserts that trial counsel filed an insufficient motion to suppress the fruits of an unlawful search conducted pursuant to a warrant issued on May 1, 2008. (Doc. No. 13-1 at 122–33.) This claim, too, was raised by Attorney Campbell (Doc. No. 13-27 at 31–34) and responded to by the State (Doc. No. 13-29 at 53) but not addressed on the merits by the post-

40

conviction trial court or asserted on post-conviction appeal. Even if *Martinez* applies to this claim, the claim is plainly not substantial.

Petitioner's arguments in support of this claim (Doc. No. 2 at 68–71) repeat the arguments made in the post-conviction trial court by Attorney Campbell. (Doc. No. 13-27 at 31–34.) Petitioner critiques the 14-page motion to suppress filed by his trial counsel in the first Williamson County case (Doc. No. 13-1 at 107–121)[12] and asserts the legal arguments Petitioner would have offered instead of, or in addition to, the arguments made by trial counsel in that motion or at the suppression hearing that followed. (Doc. No. 13-5.) One witness testified at the suppression hearing: Officer Elliott Hamm of the Brentwood Police Department. Officer Hamm conducted a traffic stop of Petitioner in the early morning hours of April 28, 2008, and that traffic stop yielded the facts that were offered as probable cause for the May 1, 2008 search warrant. (*See* Doc. No. 13-1 at 130–31.) The suppression motion was heard and denied by the trial court, and its denial was upheld by the TCCA on direct appeal, based on the determination that Officer Hamm's warrantless stop of Petitioner was constitutionally permissible. *State v. Burdick*, 2013 WL 2642313, at *7–8. Petitioner now claims that counsel was deficient in failing to argue that "Petitioner was, at most, a mere suspect in what was alleged to be an attempted car burglary" when he was stopped by Officer Hamm. (Doc. No. 2 at 68.) He further claims that counsel failed to (1) cite applicable Sixth Circuit cases or (2) conduct an adequate investigation into the veracity of the allegations made in the search warrant affidavit, either of which would have produced a better chance at suppression than the authorities and arguments used by counsel to show a lack of probable cause. (*Id.* at 68–71.)

---

[12]     Counsel's suppression motions were filed within days of the July 28, 2009 severance of the Williamson County cases and were expressly incorporated into proceedings in the second case (Doc. No. 13-4 at 79–81) on Attorney Ausbrooks's motion. (*Id.* at 41–42.)

41

Petitioner's contentions as to what issues should have been argued and what cases should have been cited fail for the same reason: counsel did in fact make the arguments Petitioner advances, even if different cases were cited to support those arguments. Petitioner contends that counsel should have argued that the judicial authorization to search his house and person for evidence of rape was unlawful because it followed an initial detention on suspicion of an altogether different crime. He also argues that counsel should have cited certain Sixth Circuit cases—all of which found a lack of probable cause to search a residence for evidence of a crime that was disconnected, by factual context or by the passage of time, from the reason the resident was being investigated.[13] But counsel's suppression motion pointed out that the search warrant affidavit referred to multiple rapes and other attacks that were attributed to the then-unknown "Wooded Rapist" between 1994 and 2006, only one of which occurred (in 2004, against K.A.) in the Meadowlake neighborhood where Petitioner was stopped by Officer Hamm, and the rest of which occurred in the Forest Hills area. (Doc. No. 13-1 at 113.) Counsel argued:

> This 2004 rape occurred about two blocks away from where a suspicious person was seen in the early morning hours of April 28, 2008. For the search warrant to be valid, the affidavit must show probable cause that Robert Burdick committed this 2004 rape, and that the searches of his person, residence, business and vehicle would uncover evidence that he did commit that crime.
>
>      . . .

---

[13]       *See United States v. Hodson*, 543 F.3d 286, 292 (6th Cir. 2008) (considering defective warrant application that "established probable cause for one crime (child molestation) but designed and requested a search for evidence of an entirely different crime (child pornography)"); *United States v. Hython*, 443 F.3d 480, 486–87 (6th Cir. 2006) (finding warrant "invalid on staleness grounds" where residence alleged to be locus of drug activity, but without any indication of when such activity took place); *United States v. Laughton*, 409 F.3d 744, 747 (6th Cir. 2005) (finding a lack of probable cause where warrant application "failed to make any connection between the residence to be searched and the facts of criminal activity that the officer set out in his affidavit . . . [and] also failed to indicate any connection between the defendant and the address given or between the defendant and any of the criminal activity that occurred there"). (Plaintiff also cites *United States v. Spikes*, 158 F.3d 913 (6th Cir. 1998), for its purported finding that a search warrant application lacked indicia of recent criminal activity and was thus stale, but the application in *Spikes* was determined not to be stale because the alleged criminal activity at the residence "was of an ongoing and continuous nature." *Id.* at 924.)

42

The mere fact that a man was seen on foot in the Meadowlake neighborhood early in the morning on April 28, 2008 is not probable cause that the same man committed a rape in this neighborhood in November 2004, nor that this man committed multiple rapes in the Forest Hills area between 1994 and 2006.

In order to establish probable cause, an affidavit must set forth facts from which a magistrate can determine "whether the facts are too stale to establish probable cause at the time issuance of the warrant is sought." *State v. Vann*, 976 S.W.2d 93, 105. … While the lapse of time between the commission of a crime and the issuance of a search warrant may affect the likelihood that incriminating evidence will be found, probable cause is a case-by-case determination. ...

The fact that a man was walking in a neighborhood late at night, even if that neighborhood has no noticeable foot traffic, does not suggest that this particular man committed a rape in the same neighborhood four years earlier. That a rape had been committed four years earlier does not suggest that the man on foot committed that earlier offense. The lengthy time span between the 2004 rape and the suspicious person seen on April 28, 2008 destroys any possible nexus between the two events.

(*Id.* at 114–16.) Thus, rather than failing to argue the disconnect between grounds for Petitioner's initial detention and the evidence targeted by the subsequent search warrant, counsel actually focused the trial court's attention on these matters. Petitioner's claim to the contrary fails.

Petitioner further claims that counsel failed to conduct an adequate investigation into the veracity of the allegations made in the search warrant affidavit. He asserts that an adequate investigation would have caused counsel to challenge Officer Hamm's explanation that Petitioner appeared to have "just changed" into dry clothes (which were not "dark" as the original report of a suspicious-looking person had indicated) and the corresponding suggestion that it had recently rained, when public weather reports would have shown "an absence of precipitation on April 28, 2008."[14] (Doc. No. 2 at 69–70.) Petitioner further asserts that trial counsel should have discovered the falsity of the affidavit's allegation that a 2005 sketch of "the Wooded Rapist" "closely resembled Robert Burdick's most recent State of Tennessee issued Driver License photograph."

---

[14]     The Court notes that Officer Hamm's encounter with Petitioner took place during the early morning hours of April 28, 2008. Petitioner does not make any argument that refers to public weather reports for days prior to April 28.

43

(*Id.* at 70.) But again, both inconsistencies—Petitioner's clothing compared to the reportedly dark clothing of the suspect, and his resemblance to a sketch of the man suspected of being "the Wooded Rapist"—were raised in counsel's suppression motion:

> When Mr. Burdick was stopped by Officer Hamm, he did not even match the description of the suspicious person described on the 911 call. … The suspicious person was described as a man about 5'7" in dark clothes with a black mask over his face. When Officer Hamm stopped Robert Burdick in his Jeep at 1:30 a.m., he described him as 5'11", 200 pounds with a muscular build, brown hair and blue eyes. He was wearing camouflage pants, with tennis shoes and a gray T-shirt. These descriptions do not match.
>            . . .
>
> The affidavit also asserts that Robert Burdick matches the sketch of the "Wooded Rapist" done by the TBI. … [However], the TBI sketch that was done in 2005 is not incorporated into the affidavit, nor does the affidavit incorporate Robert Burdick's driver's license photograph. Thus, there is no way that a magistrate could compare the photograph of Robert Burdick with the TBI sketch of the man who attempted to rape a woman in 2005.

(Doc. No. 13-1 at 117–19.)

While Petitioner might in hindsight prefer that a finer point have been put on certain arguments for suppression, that different or additional cases have been cited, or that factual inconsistencies in the warrant application have been put under a brighter spotlight, those preferences do not support a substantial claim of ineffective assistance of counsel in this case. This defaulted claim is not saved by *Martinez*.

### f. Claim 3(f) – Failure to Argue Mitigating Factor Required by Statute

Lastly, Petitioner claims that trial counsel failed to "argue and require" that the trial court consider at sentencing the mitigating factor that the victim was voluntarily released alive— consideration which Section 39-13-304(b)(2) of the Tennessee Code mandates. (Doc. No. 2 at 71– 79.) That Code section, which defines the crime of aggravated kidnapping, provides that "[i]f the offender voluntarily releases the victim alive or voluntarily provides information leading to the

victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing." Tenn. Code Ann. § 39-13-304(b)(2). K.A., the rape and kidnapping victim in this case, was released alive. In sentencing Petitioner, the trial court found that "the record substantially supports" the aggravating factor of his "previous history of criminal convictions, without even getting to the question of his criminal behavior[.]" (Doc. No. 13-13 at 36.) The court then "[t]urn[ed] to the question of mitigating factors" and found that "there have been none argued by the defense, and the Court has reviewed the statute to see if any are present in this case, and find[s] that the record is void of any such factors." (*Id.*) The transcript of the sentencing hearing does not reveal any explicit consideration of the fact that K.A. did not escape but was allowed to return to her home after Petitioner raped her.

Even though trial counsel might ideally have objected to the court's failure to explicitly consider a statutorily required mitigating factor, this Court does not view counsel's failure to do so as an instance of deficient performance "so serious that counsel was not functioning as the 'counsel' guaranteed [his client] by the Sixth Amendment." *Strickland*, 466 U.S. at 687. More saliently though, and as Respondent argues, this claim is also insubstantial because Petitioner cannot show prejudice. The Sentencing Commission Comments to § 39-13-304(b) state that the court is required "to consider the voluntary safe release of the victim as a mitigating factor. This provision reflects the concern for the safety of the victim." *See State v. Pipkin*, No. 01C01-9605-CR-00210, 1997 WL 749430, at *8 (Tenn. Crim. App. Dec. 4, 1997) (discussing same comment to subsection (b) of especially aggravated kidnapping statute). Petitioner's claim that, after kidnapping, blindfolding with duct tape, throwing to the ground, and raping his victim, he released her "unharmed" (Doc. No. 2 at 76–77) is *manifestly* untrue. The trial court specifically found, based on the testimony it received, that K.A. was:

put in extreme fear and danger for whether or not she was going to get out of this alive, and also that of her family was something that was on her mind and whether or not they would be survivors of this incident, the hour that you went into these – to the victim's home, the manner, the secluded area in which you carried out this heinous offense, certainly satisfies the Court that there is evidence in the record that you're an individual who is dangerous, and your behavior certainly has indicated that you have – it goes beyond a little; it goes almost to the point of absolutely no regard for human life, and you have no hesitation about committing crime in which the risk to human life is high.

(Doc. No. 13-13 at 39–40.) The court then found it "altogether appropriate" to order that Petitioner's sentence "be served consecutive to the 112-year sentence that [Petitioner was] already facing from [his] three Davidson County cases and [his] one Williamson County case." (*Id.* at 41.) The court found that "[j]ustice demands it," and, when asked by defense counsel whether a fine would also be imposed, expressed its intent that Petitioner "spend every day of the rest of his life in jail; I'm not interested in collecting a nickel from him. No fine." (*Id.* at 41–42.)

Under these circumstances, and as found by the court in *Pipkin,* "[e]ven if applicable, this mitigating factor" of voluntary release of the victim alive under § 39-13-304(b)(2) "would be entitled to little, if any, weight." 1997 WL 749430, at *8. *See also Nelson*, 2024 WL 1192985, at *16 (finding that although mitigation evidence "should have been considered and addressed . . . even if the trial court ultimately assigned little or no weight to it," the trial court's sentencing determination was due deference on appeal, where record supported finding that "trial court was aware of the mitigating circumstances but implicitly rejected them"). This Court finds it safe to say in this instance that any deficient performance by trial counsel in failing to "argue and require" explicit consideration of this mitigating factor was nonprejudicial under *Strickland*, as the fact that Petitioner released the victim after kidnapping and raping her was likely implicitly rejected as a factor that the sentencing court could view as mitigating, and, in any event, obviously had no real

46

likelihood of altering the result of the proceeding. *Strickland*, 466 U.S. at 694. This claim of ineffective assistance is insubstantial, and therefore cannot be further considered.

## VI. CONCLUSION

For the reasons stated above, Petitioner is not entitled to relief under Section 2254. The Petition will be **DENIED** and this action will be **DISMISSED**.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a Section 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. A petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2). A "substantial showing" is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (citations and internal quotation marks omitted). "[A] COA does not require a showing that the appeal will succeed," but courts should not issue a COA as a matter of course. *Id.* at 337.

Because reasonable jurists could not debate whether Petitioner's claims should have been resolved differently or are deserving of encouragement to proceed further, the Court will **DENY** a COA. Petitioner may seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate Order is filed herewith.

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE